**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**

| | |
|---|---|
| BRIAN J. DEBARR, | ) 3:12-cv-00039-LRH-WGC |
| | ) |
| Plaintiff, | ) **REPORT & RECOMMENDATION** |
| | ) **OF U.S. MAGISTRATE JUDGE** |
| vs. | ) |
| | ) |
| TARA CARPENTER, et. al. | ) |
| | ) |
| Defendants. | ) |
| | ) |

This Report and Recommendation is made to the Honorable Larry R. Hicks, Senior United States District Judge. The action was referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and the Local Rules of Practice, LR 1B 1-4. Before the court is Defendants' Motion for Summary Judgment. (Doc. # 35, Exhibits at Docs. # 35-1 through 35-19.)[1] Plaintiff has opposed the motion. (Doc. # 40.) Defendants filed a reply. (Doc. # 47.)

After a thorough review, the court recommends that: (1) Defendants' motion be granted; (2) Plaintiff's request for a delay in considering the motion be denied; (3) Plaintiff's remaining federal law claims under 42 U.S.C. § 1985 and 42 U.S.C. § 1986 be dismissed with prejudice;

---

[1] Refers to court's docket number.

1

and (4) that the court decline to exercise supplemental jurisdiction over Plaintiff's state law claims.

## I. BACKGROUND

At all relevant times Plaintiff Brian J. Debarr was an inmate in custody of the Nevada Department of Corrections (NDOC). (Pl.'s Compl., Doc. # 1-1 at 10-30.) The events giving rise to this litigation took place while Plaintiff was housed at Lovelock Correctional Center (LCC). (*Id*.) Plaintiff, a pro se litigant, brings this action pursuant to 42 U.S.C. § 1983. (*Id*.) Defendants are: Tara Carpenter, Stephen Clark, Ellie Emmanuel, Don Helling, Jack Palmer, Kirk Widmar, and Greg Cox. (*Id*., Screening Order (Doc. # 7).)

Plaintiff alleges that he is a member of a pagan religious group at LCC and that in January 2009 he and other pagan religious group members were informed that part of the land authorized for use by the pagans as religious grounds at LCC would be flattened in connection with construction projects on the buildings that comprise units 3A and 3B. (Doc. # 1-1 at 13-14.) He claims that the area initially identified by the LCC administration as being affected by the construction did not include the sacred portions of the pagan religious grounds, and so the pagans made preparations to accommodate the construction project. (*Id*. at 14.) Plaintiff goes on to allege that on October 21, 2009, instead of flattening only a portion of the pagan religious grounds, the entirety of the pagan religious grounds behind units 3A and 3B were flattened. (*Id*. at 13.)

After learning of the destruction of the grounds, Plaintiff filed multiple grievances, containing one issue per grievance, as is required under Administrative Regulation (AR) 740. (*Id*. at 14.) Plaintiff subsequently received a notice of charges for abuse of the inmate grievance

2

process. (*Id.*) Plaintiff was convicted of the charge and sentenced to fifteen days disciplinary segregation. (*Id.* at 15.)

Plaintiff claims that he was identified as one of a group of pagan inmates who submitted multiple grievances regarding the destruction of the grounds, and it was recommended that he be transferred to the allegedly more secure and less desirable High Desert State Prison (HDSP). (*Id.* at 15.) Plaintiff was determined to be a threat to the safety and security of the institution for filing grievances, and was transferred to HDSP on January 13, 2010. (*Id.*) He was ultimately and transferred back to LCC in July 2011. (*Id.*)

Plaintiff further alleges that he and the other practicing pagan inmates were discriminated against when they exercised their right to redress the government by utilizing the grievance process after the destruction of the pagan grounds. (*Id.* at 16.) In addition, he asserts that he was transferred because he utilized the grievance process. (*Id.*)

On screening, the court allowed Plaintiff to proceed with the following claims: (1) a claim for retaliation for filing grievances and due to his pagan faith; (2) a claim under the First Amendment and the Religious Land Use and Institutionalized Persons Act, 42 U.S.C. § 2000-cc(1) (RLUIPA), based upon the allegations that he was retaliated against for filing the grievances and due to his pagan faith; and (3) a claim under the Equal Protection Clause for alleged discrimination against those of the pagan faith. (*Id.* at 4.)[2] The court expressed no opinion as to the viability of the state law claims asserted in Plaintiff's complaint. (*Id.*)

---

[2]  The court dismissed any claims made under the Eighth Amendment, finding that being placed in disciplinary segregation for fifteen days and administrative segregation for fifteen days does not constitute cruel and unusual punishment. (Doc. # 7 at 4.) It similarly dismissed Plaintiff's claims under the Due Process Clause of the Fourteenth Amendment, finding that being subject to disciplinary segregation, which mirrors the conditions of administrative segregation and protective custody, for less than thirty days, does not give rise to a protected liberty interest, and there is no protected liberty interest in not being transferred to a different institution. (*Id.*)

Defendants now move for summary judgment, arguing that the disciplinary action taken against Plaintiff and his transfer to HDSP were based on legitimate penological reasons, *i.e.*, the filing of this many identical grievances by these inmates took staff members away from performing their actual job functions, creating a safety and security risk to the institution, and the coordinated effort of these inmates could have escalated into something more which also posed a safety and security risk to the institution. (Doc. # 35.) They maintain that these actions were not taken as a result of Plaintiff's mere filing of grievances and were similarly not related to his pagan beliefs. (*Id.*)

Plaintiff opposes the motion, arguing that a genuine dispute as to various material facts exists precluding the entry of summary judgment in Defendants' favor. (Doc. # 40.) He contends that the disciplinary action and transfer were directly related to his filing of grievances and his pagan beliefs. (*Id.*)

## II. LEGAL STANDARD

"The purpose of summary judgment is to avoid unnecessary trials when there is no dispute as to the facts before the court." *Northwest Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471 (9th Cir. 1994) (citation omitted). All reasonable inferences are drawn in favor of the non-moving party. *In re Slatkin*, 525 F.3d 805, 810 (9th Cir. 2008) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). Summary judgment is appropriate if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of

law." *Id*. (quoting Fed.R.Civ.P. 56(c)).[1] Where reasonable minds could differ on the material facts at issue, however, summary judgment is not appropriate.  *See Anderson*, 477 U.S. at 250. The moving party bears the burden of informing the court of the basis for its motion, together with evidence demonstrating the absence of any genuine issue of material fact. *Celotex Corp.  v.  Catrett*, 477 U.S. 317, 323 (1986). Although the parties may submit evidence in an inadmissible form, only evidence which might be admissible at trial may be considered by a trial court in ruling on a motion for summary judgment.  Fed.R.Civ.P. 56(c).

In evaluating the appropriateness of summary judgment, three steps are necessary:  (1) determining whether a fact is material; (2) determining whether there is a genuine issue for the trier of fact, as determined by the documents submitted to the court; and (3) considering that evidence in light of the appropriate standard of proof. *See Anderson*, 477 U.S. at 248-250. As to materiality, only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment; factual disputes which are irrelevant or unnecessary will not be considered. *Id.* at 248.

In determining summary judgment, a court applies a burden shifting analysis. "When the party moving for summary judgment would bear the burden of proof at trial, 'it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial.'[ ] In such a case, the moving party has the initial burden of establishing the absence of a genuine issue of fact on each issue material to its case." *C.A.R. Transp. Brokerage Co.  v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir.  2000) (internal citations omitted). In contrast, when the nonmoving party bears the burden of proving the claim or

---

[1]Federal Rule of Civil Procedure 56 was amended in 2010 to state: "The court shall grant summary judgment if the movant shows that there is no genuine *dispute* as to any material fact and the movant is entitled to judgment as a matter of law." (Emphasis added.) The analysis under the cases cited, however, remains the same.

defense, the moving party can meet its burden in two ways: (1) by presenting evidence to negate an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial. *See Celotex*, 477 U.S. at 323-25. If the moving party fails to meet its initial burden, summary judgment must be denied and the court need not consider the nonmoving party's evidence. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 160 (1970).

If the moving party satisfies its initial burden, the burden shifts to the opposing party to establish that a genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). To establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987)(quotation marks and citation omitted). The nonmoving party cannot avoid summary judgment by relying solely on conclusory allegations that are unsupported by factual data. *Id*. Instead, the opposition must go beyond the assertions and allegations of the pleadings and set forth specific facts by producing competent evidence that shows a genuine issue for trial. *See* Fed.R.Civ.P. 56(e); *Celotex*, 477 U.S. at 324.

At summary judgment, a court's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial. *See Anderson*, 477 U.S. at 249. While the evidence of the nonmovant is "to be believed, and all justifiable inferences are to be drawn in its favor," if the evidence of the nonmoving party is merely colorable or is not

significantly probative, summary judgment may be granted. *Id*. at 249-50, 255 (citations omitted).

### III. DISCUSSION

**A. Summary of Relevant Facts**

Defendants acknowledge that on October 20, 2009, LCC performed maintenance to the exterior of certain buildings which they concede resulted in "some flattening" of outdoor religious grounds, including the pagan grounds. (Doc. # 35 at 3, Ex. A at Doc. # 35-1 at 2-3.)[3] It is Plaintiff's position that the entirety of the pagan grounds was destroyed by the project. (See Doc. # 40 at 9.) Defendants also concede that some of the pagan inmates were upset by this action, claiming that the grounds had been flattened more than necessary. (Doc. # 35 at 3, Ex. A at Doc. # 35-1 at 2; Doc. # 40 at 9.)

In fact, fifteen inmates filed at least twenty-one identical grievances raising twenty-one separate issues relating to their pagan beliefs and perceived wrongdoing following the flattening of the grounds. (*Id*.; Emmanuel Decl.  at Doc. # 35-29 at 3 ¶¶ 9-11; Palmer Decl. at Doc. # 35-30 at 3 ¶¶ 8-10; Helling Decl. at Doc. # 35-31 at 3 ¶¶ 6-8; Doc. # 40 at 9; Widmar Decl. at Doc. # 35-33 ¶ 5.) Plaintiff was one of these inmates. (Doc. # 35 at 3; Emmanuel Decl. at Doc. # 35-29 at 3 ¶ 10; Palmer Decl. at Doc. # 35-30 at 3 ¶ 9; Helling Decl. at Doc. # 35-31 at 3 ¶ 7; Doc. # 40 at 9.)

After the inmates filed the identical grievances, defendant Emmanuel, a caseworker at LCC, conferred with defendant Palmer, who was then LCC's warden, who directed her to

---

[3] Exhibit A is a memorandum from defendant Emmanuel via defendant Palmer to defendant Helling dated November 3, 2009, stating that LCC was "having the outer walls of [its] buildings sealed" and that "Unit 3A and 3B PS pagan and Native American inmates were told...that the area they use for religious activity would have to be flattened somewhat for the safety of the equipment," and that on "October 20, the ground behind 3A and 3B, used by the pagan and Native American inmates, was smoothed out and flattened, the wall sealing work was done, and arrangements were made to give the inmates extra time to work on the land and fix it up again." (Doc. # 35-1 at 2.)

prepare a memorandum to defendant Deputy Director Helling, recommending that the inmates be charged with abuse of the grievance procedure as set forth in AR 740. (Doc. # 35 at 3; Emmanuel Decl. at Doc. # 35-29 at 3 ¶ 12; Palmer Decl. at Doc. # 35-30 at 3 ¶ 11.)

Defendant Emmanuel determined that the apparent purpose of the filing of these grievances was to harass and irritate LCC staff, which was supported by the reaction of certain inmates on November 2, 2009, when Caseworker Specialist Belanger reported a group of inmates standing outside the staff office waiting and laughing upon seeing her reaction when picking up the number of grievances. (Emmanuel Decl. at Doc. # 35-29 at 4 ¶ 18; *see also* Palmer Decl. at Doc. # 35-30 at 4 ¶ 17, Helling Decl. at Doc. # 35-31 at 4 ¶ 14.)

Defendant Emmanuel likewise concluded that this conduct created a safety and security risk to the institution because each grievance must be reviewed by staff to determine whether it raises a legitimate claim, and unless a claim is facially frivolous or unfounded, staff conduct some degree of investigation into the subject matter of the grievance, which demands the time and attention of the staff member and takes away from performing other job functions. (Emmanuel Decl. at Doc. # 35-29 at 4 ¶ 16; *see also* Palmer Decl. at Doc. # 35-30 at 4 ¶ 15; Helling Decl. at Doc. # 35-31 at 3-4 ¶ 12.) When numerous inmates simultaneously filed grievances, as these inmates did in October and November of 2009, the burden on staff creates opportunities for safety risks to inmates and staff. (Emmanuel Decl. at Doc. # 35-29 at 4 ¶ 17; Palmer Decl. at Doc. # 35-30 at 4 ¶ 16; Helling Decl. at Doc. # 35-31 at 4 ¶ 13.)

Defendant Emmanuel prepared the memorandum to defendant Helling. (Doc. # 35 at 4, Ex. A  at Doc. # 35-1 at 2-3).)[4] According to defendants Emmanuel and Palmer, the decision to

---

[4]  Again, Exhibit A contains the November 3, 2009 memorandum, alerting defendant Helling to the filing of twenty-one identical grievances by these fifteen inmates and stating: "Because of the timing of these grievances, the inmates' intent seems to be to harass and  irritate LCC staff. When CCSII Belanger picked up grievances in Unit 3B

recommend that inmates, including Plaintiff, be charged with abuse of the grievance process, was unrelated to Plaintiff's religious beliefs, and instead was based solely on the number of grievances filed during the period of time and apparent coordinated effort by the group of inmates to disrupt operations at LCC. (Emmanuel Decl. at Doc. # 35-29 at 5 ¶ 22; Palmer Decl. at Doc. # 35-30 at 5 ¶ 19.)

It is Plaintiff's position that he did not knowingly, willfully or maliciously file frivolous or vexatious grievances. (Doc. # 40 at 9.) He asserts that in response to the individual grievances, he did not receive an improper grievance form indicating that the grievances were abusive. (*Id.*)

AR 740 governs the inmate grievance procedure, and prohibits abuse of the process: "inmates are prohibited from knowingly, willfully or maliciously filing frivolous or vexatious grievances, which are considered to be an abuse of the Inmate Grievance Procedure." (Doc. # 35 at 3.)

Defendant Helling reviewed the letter from defendant Emmanuel and directed that each of the fifteen inmates, including Plaintiff, be charged with abuse of the grievance process. (Doc. # 35 at 4; Emmanuel Decl. at Doc. # 35-29 at 3 ¶ 13; Palmer Decl. at Doc. # 35-30 at 3 ¶ 12; Helling Decl. at Doc. # 35-31 at 3 ¶¶ 9-10.) This decision, according to defendant Helling, was unrelated to Plaintiff's religious beliefs, and instead was based solely on the number of grievances filed during the period of time and the apparent coordinated effort to disrupt operations at LCC. (Helling Decl. at Doc. # 35-31 at 4 ¶ 16.) Plaintiff disputes this, and maintains that the disciplinary action was taken because he was exercising his First Amendment right to file grievances and because of his pagan faith. (Doc. # 40.)

on November 2, she reported that this group stood outside the staff office laughing, watching to see what her reaction would be to the number of grievances..." (Doc. # 35-1 at 2.)

Plaintiff was served with a notice of charges for abuse of the grievance process. (*See* Doc. # 35-32 at 2.) Plaintiff entered a plea of not guilty. (*Id*.)

On December 15, 2009, defendant Widmar conducted the disciplinary hearing for the charge, and after he considered Plaintiff's testimony, reviewed the subject grievances and memorandum prepared by defendant Emmanuel, he found Plaintiff guilty. (Widmar Decl. at Doc. # 35-33 at 3 ¶¶ 7-8.) According to defendant Widmar, his decision was not based on Plaintiff's religious affiliation or beliefs, but only on Plaintiff's involvement in filing numerous identical grievances as those filed by other inmates. (*Id*.) Again, Plaintiff maintains that the decision was directly related to his First Amendment activity and pagan beliefs. (Doc. # 40.)

In addition, defendants Emmanuel and Palmer, among others, believed that these inmates' continued housing together in the administrative segregation unit at LCC presented a legitimate safety and security risk to the institution because the number of grievances filed created an undue burden on staff and their ability to perform other job functions. (Emmanuel Decl. at Doc. # 35-29 at 4 ¶¶ 14-15; Palmer Decl. at Doc. # 35-30 at 4 ¶¶ 13-14; Helling Decl. at Doc. # 35-31 at 3 ¶ 11.) They were concerned that the coordinated efforts of these inmates could escalate beyond filing grievances, possibly to a violent confrontation; therefore, it was determined that the inmates should be split up in furtherance of the legitimate penological interests of LCC and NDOC. (Emmanuel Decl. at Doc. # 35-29 at 4-5 ¶ 19; *see also*  Palmer Decl. at Doc. # 35-30 at 4 ¶ 18.)

This determination was officially made at a classification hearing that took place on December 29, 2009, and it was specifically noted that the decision was not an adverse classification and Plaintiff was transferred to HDSP at the same custody level. (Emmanuel Decl. at Doc. # 35-29 at 5 ¶ 20; Doc. # 35-34 at 4 (*see* entry dated Dec. 29, 2009).) According to

Defendants, the decision to transfer Plaintiff to HDSP was not based on his religious beliefs but on the legitimate safety and security concerns of LCC and the fact that he did not have any known enemies at HDSP and he did have known enemies identified at Southern Desert Correctional Center and Northern Nevada Correctional Center. (Emmanuel Decl. at Doc. # 35-29 at 5 ¶¶ 21, 23; Palmer Decl. at Doc. # 35-30 at 5 ¶ 20; Doc. # 35-34 at 4 (*see* entry dated Dec. 29, 2009).)

Plaintiff was transferred to HDSP, and arrived there on January 12, 2010. (*See* Doc. # 35-34 at 4, entry dated January 12, 2010.) He was returned to LCC in July 2011. (*See* Doc. # 35-34 at 5, entry dated July 7, 2011.)

Plaintiff maintains that his transfer was in direct retaliation for filing grievances. (Doc. # 40 at 11.) In addition, he asserts that Defendants knew he would not be able to practice his pagan faith at HDSP given the security restrictions there and his protective segregation status. (*Id*. at 12.)

**B. Plaintiff's Request for a Delay in Considering Defendants' Motion (Rule 56(d))**

Plaintiff mentions Federal Rule of Civil Procedure 56(f)'s provision, now set forth in Rule 56(d), that "[i]f a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may: (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order." (*See* Doc. # 40 at 6-8.)

While Plaintiff asserts that certain discovery responses were not forthcoming from Defendants, he does nothing to establish why this discovery is essential to justify his opposition to Defendants' motion.

Plaintiff makes vague reference to the need for production of the recording of his disciplinary hearing; however, his federal procedural due process claim has been dismissed and he fails to state why production of the tape is necessary for him to oppose Defendants' motion as to his remaining claims. Nevertheless, Defendants have provided the declaration of Dwayne Deal, Acting Associate Warden of LCC, who is the custodian of records for inmate grievances and institutional files at LCC, who states that he personally searched for and was unable to locate any such recording. (*See* Doc. # 47-2.)

Plaintiff includes a declaration that states he needs discovery "to establish a prima facie rejection or factual defense, as to the genuine issues of material facts on those 42 U.S.C. §1983 Civil Rights Claims in Counts I, II, and III Facing a Dispositive Pleading." (Doc. # 40-1 at 44-45 ¶ 6.) This general and conclusory statement, however, does not specifically identify what discovery he needs and why it is necessary to oppose Defendants' motion for summary judgment. Accordingly, to the extent Plaintiff's opposition can be construed as a request for deferral or delay in considering the motion for summary judgment, the request should be denied as Plaintiff has not established how the asserted outstanding discovery is essential to his opposition.

**C. Retaliation**

**1. Legal Standard**

A retaliation claim contains five elements: "(1) an assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal." *Rhodes v. Robinson*, 408 F.3d 559, 567-68 (9th Cir. 2005) (citations omitted); *see also Brodheim v. Cry*, 548 F.3d 1262, 1269 (9th Cir.

2009) (citation omitted). Retaliation claims must be evaluated in light of the deference that must be accorded to prison officials. *See Pratt v. Rowland*, 65 F.3d 802, 807 (9th Cir. 1995).

An inmate must submit evidence, either direct or circumstantial, to establish a link between the exercise of constitutional rights and the allegedly retaliatory action. *Pratt*, 65 F.3d at 806-07. "[A] plaintiff must show that his protected conduct was the 'substantial' or 'motivating' factor behind the defendant's conduct." *Brodheim*, 584 F.3d at 1271 (internal quotation marks and citation omitted). The plaintiff "need only 'put forth evidence of retaliatory motive, that, taken in the light most favorable to him, presents a genuine issue of material fact as to [the defendant's] intent[.]" *Id*. (internal citation omitted). Timing of the events surrounding the alleged retaliatory action may constitute circumstantial evidence of retaliatory intent. *See Sorrano's Gasco, Inc. v. Morgan*, 874 F.2d 1310, 1316 (9th Cir. 1989). A plaintiff's mere speculation that there is a causal connection is not enough to raise a genuine issue of material fact. *See Nelson v. Pima Comm. College*, 83 F.3d 1075, 1081-82 (9th Cir. 1996) (citation omitted).

**1. Disciplinary Action**

There is no question that Plaintiff was subjected to adverse action when disciplinary action was taken against him after he and a group of fourteen other inmates filed twenty-one identical grievances. Nor is there any doubt that Plaintiff has a First Amendment right to file prison grievances. *See Rhodes*, 408 F.3d at 567.

While it does not appear that Plaintiff's exercise of his First Amendment rights was chilled as he continued to file grievances subsequent to this event, the inquiry is objective: whether the conduct "would chill or silence a person of ordinary firmness from future First Amendment activities." *Brodheim*, 584 F.3d at 1271 (internal quotation marks and citation

omitted). Under these circumstances, the court finds it would not. Plaintiff was subjected to disciplinary action because he and fourteen other inmates each filed twenty-one identical grievances, for a total of more than 300 grievances, inundating LCC staff and distracting them from their duties. The disciplinary action was not focused on the fact that Plaintiff was filing a grievance; instead, it was focused on the deluge of grievances that appeared to be timed to harass LCC staff and as a result threatened to overwhelm LCC's staff and take them away from their job functions.

This is supported by the memorandum defendant Emmanuel sent to defendant Helling, stating that these inmates each filed twenty-one grievances and that some of the issues should have been first addressed with kites or through the religious accommodation process, that some inmates did not have standing with respect to certain grievances, and many of the issues did not just arise (so as to necessitate filing the grievances during that time period). (Doc. # 35-1 at 2-3; *see also* Emmanuel Decl. at Doc. # 35-29 at 3-4 ¶¶ 9-18.) This information tends to show that the grievances were timed with an intent to harass LCC staff after the members became upset at the flattening of the religious grounds. In response, defendant Emmanuel, along with defendant Palmer, recommended to defendant Helling that these inmates receive a notice of charges for abuse of the inmate grievance procedure. In turn, Defendant Helling directed the issuance of the notice of charges.  (Helling Decl. at Doc. # 35-31 at 3 ¶¶ 6-10.)

Under these circumstances, it does not appear that a person of ordinary firmness would have been chilled from engaging in future First Amendment activities.

Even if Plaintiff could establish that a person of "ordinary firmness" would have been chilled from engaging in future First Amendment Activities, he has not overcome Defendants' assertion that they did not discipline Plaintiff simply because he was filing grievances but

14

because of the coordinated nature of the filings which posed a safety and security risk, and as such, their conduct advanced a legitimate correctional goal.

Defendants maintain that Plaintiff was not disciplined for engaging in protected First Amendment activity but because the group of inmates' coordinated effort in filing over 300 grievances within a short period of time created an undue burden on the institution, taking staff away from essential job functions. (Doc. # 35 at 8-9; *see also* Helling Decl. at Doc. # 35-31 at 3 ¶ 11.) In fact, each inmate grievance must be reviewed by staff to determine whether it raises a legitimate claim, and unless a claim is facially frivolous or unfounded, staff will conduct some degree of investigation into the subject matter of the grievance, which demands the time of the staff member and takes them away from performing their other job functions. (*Id*. at 3-4 ¶ 12.) When numerous inmates simultaneously file this many grievances, as occurred in this instance, the burden on staff creates opportunities for safety risks to the inmates as well as staff. (*Id*. at 4 ¶ 13.) Based upon the staff's inquiry into the simultaneous filing of numerous grievances, it was determined that the apparent purpose was to harass and irritate LCC staff, which was deemed an abuse of the prison grievance process, and for this reason Plaintiff was subjected to disciplinary action. (*Id*. ¶ 14.) The determination was not based on Plaintiff's religion or the basic fact that he was filing a grievance. (*Id*. ¶ 16.)

"[I]n determining whether a proffered legitimate penological interest is reasonably related to a regulation which infringes on a prisoner's constitutional right" the court must consider the "four factors set forth in *Turner v. Safley*, 482 U.S. 78," which are:

A 'valid rational connection' between the prison regulation and the legitimate [and neutral] governmental interest put forward to justify it.' If the connection between the regulation and the asserted goal is 'arbitrary and irrational,' then the regulation fails, irrespective of whether the other factors tilt in its favor. In addition, courts should consider three other factors: existence of 'alternative means of exercising

the right' available to inmates; 'the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally'; and 'the absence of ready alternatives' available to the prison for achieving the governmental objectives.

*Brodheim*, 584 F.3d at 1272 (internal citations omitted).

Here, the prison regulation at issue is AR 740's prohibition on abuse of the prison grievance process. The legitimate government interest put forward to justify the regulation is the safety and security of the institution which Defendants assert was undermined when the staff was inundated with numerous identical grievances.

The declaration of defendant Carpenter specifically states that when these inmates filed some 300 grievances in less than one month, "it resulted in a significant disruption to LCC operations and mandated the consumption of a large amount of staff time for handling the grievances instead of attending to their regularly assigned duties." (Carpenter Decl. at Doc. # 47-1 at 3 ¶ 4.)

There court finds a valid rational connection exists between NDOC's regulation prohibiting abuse of the prison grievance process and the legitimate safety and security concerns the Defendants have advanced to justify the regulation, as evidenced in the declaration of defendant Carpenter. The court likewise finds the asserted government objective is legitimate and neutral.

The court also considers the existence of "alternative means of exercising the right" available to inmates, and finds that such alternative means in fact exist. Inmates are directed by AR 740 to try to informally resolve such issues through their caseworkers. Defendants also mention an informal resolution process related specifically to complaints related to religious issues. If informal resolution is unsuccessful, the inmates can independently grieve the perceived

religious issues as they arise, instead of submitting identical grievances regarding twenty-one separate issues all at once.

Next, the court considers "the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally." Here, if Defendants permitted this type of conduct to occur they would be faced with having to divert the attention of prison staff from their actual job functions to investigate each and every grievance. This would obviously create a potential for a security or safety breach and would pose a risk to inmates as well as staff.

Finally, the court considers "the absence of ready alternatives" available to the prison for achieving the governmental objectives. "[T]he existence of obvious, easy alternatives may be evidence that the regulation is not reasonable, but is an 'exaggerated response' to prison concerns." *Turner*, 482 U.S. at 90. In *Turner*, the Supreme Court made the following comment regarding this factor:

> Prison officials do not have to set up and then shoot down every conceivable alternative method of accommodating the claimant's constitutional complaint...But if an inmate claimant can point to an alternative that fully accommodates the prisoner's rights at *de minimis* cost to valid penological interests, a court may consider that as evidence that the regulation does not satisfy the reasonable relationship standard.

*Id.* Here, there do not appear to be any obvious, easy alternatives for dealing with an abuse of the grievance process such as what occurred in this case. Nor does Plaintiff point to any alternative that would accommodate his rights while preserving valid penological interests.

Plaintiff merely asserts that he properly utilized NDOC's grievance process to air his complaints related to his pagan beliefs. (Doc. # 40 at 15.) While he concludes that Defendants cannot demonstrate their conduct served a legitimate penological purpose (*id.* at 16), he provides no evidence to refute their asserted legitimate penological purpose.

17

As a result, the court concludes summary judgment should be granted in Defendants' favor as to Plaintiff's claim that he was retaliated against when he was subjected to disciplinary action.

**2. Transfer**

Next, the court will address Plaintiff's claim that Defendants retaliated against him for filing grievances or based on his religion by transferring him to HDSP.

Defendants argue that Plaintiff's claim that he was transferred from LCC to HDSP in retaliation for exercising his First Amendment rights similarly fails. (Doc. # 35 at 10.) Defendants maintain that the decision to transfer Plaintiff to LCC was based on legitimate safety and security concerns in face of the coordinated effort of these inmates to disrupt operations at LCC and the possibility that their effort could turn violent. (*Id*.) They also point out that the transfer was not an adverse classification, and Plaintiff was transferred to an equivalent institution where he did not have enemies. (*Id*.)

Even assuming that the transfer to HDSP is considered adverse action, the court finds that Defendants have advanced a legitimate correctional goal for doing so and that Plaintiff has not presented evidence to create a genuine issue of material fact as to this element of his claim.

According to defendant Emmanuel:

18. Ultimately, it was found, based upon the staff's inquiry into the simultaneous filings of numerous grievances by Mr. DeBarr and the other inmates that the apparent purpose was to harass and irritate LCC staff. This was supported by the reaction of certain inmates on November 2, 2009, when Correctional Caseworker Specialist Belanger reported a group of the inmates standing outside the staff office waiting and laughing upon seeing her reaction when picking up the number of grievances.
19. Based upon this concern that the coordinated efforts of these inmates could escalate beyond filing grievances, but to a violent confrontation, it was determined that the group of inmates should be split up in furtherance of the legitimate penological interests of LCC and NDOC.

20. On December 29, 2009, a classification hearing took place with myself, acting Associate Warden of Operation, Robert Legrand and Correctional Caseworker Specialist III Dwayne Deal regarding Mr. DeBarr's classification. At that hearing, it was decided that based upon the continued safety of LCC's protected segregation unit, in the interest of the inmate adjustment, it would be best to split [up] the group of inmates. It was specifically notated that the decision was not an adverse classification and Mr. DeBarr was transferred to HDSP and at the same custody level.

21. The decision to transfer Mr. DeBarr to HDSP was based on the fact that he did not have any known enemies at the institution where he had enemies identified at Southern Desert Correctional Center and Northern Nevada Correctional Center.

...

23. Additionally, the decision to transfer Mr. DeBarr to HDSP was not based upon his religious beliefs, but the legitimate safety and security concerns related to the group activities which had occurred.

(Emmanuel Decl. at Doc. # 35-29 at 4-5 ¶¶ 18-21, 23 ; *see also* Palmer Decl. at Doc. # 35-30 at 4-5 ¶¶ 17-18, 20.)

In addition, defendant Carpenter states that "group demonstrations or disruptions created a safety and security risk to any institution. This collective effort was considered a safety and security concern." (Carpenter Decl. at Doc. # 47-1 at 3 ¶ 5.)  "Plaintiff was transferred to [HDSP] to disperse the inmates who had collectively created the disruption at LCC." (*Id.* ¶ 6.)

The decision to transfer Plaintiff, as opposed to other inmates was based upon the fact that he did not have any enemies identified at HDSP. Additionally, he did not have any medical restrictions (i.e. lower bunk or flat yard), which precluded his transfer to the institution. Finally, Plaintiff's classification did not restrict his eligibility to be transferred to HDSP, nor was it an adverse transfer. Plaintiff was transferred from one closed custody institution to another closed custody institution.

(*Id.* ¶ 7.) Defendant Carpenter likewise states that the transfer was not based on Plaintiff's religious beliefs, but only on "the safety and security concerns with the collective actions of these inmates and the risk their continued housing together created for LCC and NDOC." (*Id.* at 3-4 ¶ 8.)

Plaintiff simply states that Defendants transferred him to a more secure institution in retaliation for filing grievances, under the guise of a security risk, when they knew his ability to

practice his pagan religion would be greatly diminished if he were housed at HDSP. (Doc. # 40 at 17.)

As evidence, Plaintiff has submitted a kite he sent to the warden of HDSP asking for access to pagan religious grounds where he received the following response: "No place of worship/service for PS Pagan I/Ms @ HDSP." (Doc. # 40 at 83.) This does not provide evidence that the defendants named in this action, who were employed at LCC, transferred Plaintiff to HDSP for filing grievances or because of his religious affiliation. While he speculates they knew he would not have access to pagan religious grounds at HDSP, he provides no supporting evidence, *i.e.* evidence that these defendants knew that Plaintiff would not have access to pagan religious grounds at HDSP and that was a motivating factor in their decision to transfer him there. Instead, Defendants assert that Plaintiff was transferred to HDSP because the coordinated group activity he engaged in was deemed a safety and security risk.

Again, the court must utilize the *Turner* factors in considering whether the proffered legitimate penological interest—the safety and security of the institution in light of the coordinated activity of this group—is reasonably related to the regulation Plaintiff's asserts infringes his constitutional rights.

The court concludes the penological interest advanced by Defendants is reasonably related to the decision to transfer Plaintiff to HDSP after he was found to have engaged in coordinated activity which abused the prison grievance procedure.

First, the court finds there is a "valid rational connection" between the safety and security interest proffered by Defendants and Plaintiff's transfer to HDSP. It is reasonable for the institution to be concerned about group activity perceived to disrupt operations at LCC and to

harass prison staff permeating into something even bigger and potentially into a violent confrontation. (*See* Emmanuel Decl. at Doc. # 35-29 at 4 ¶ 19.)

As the court pointed out above, Plaintiff and the other inmates have alternative means of exercising their rights, *i.e.*, by trying to resolve their complaints informally or by filing independent grievances as issues arise.

Next, accommodation would have an adverse impact on guards and inmates and on the allocation of prison resources generally because the institution would be deprived of the ability to readily identify and deal with safety and security concerns such as this one.

Finally, the court is not aware of any readily available alternatives to achieving their objective, nor has Plaintiff pointed to any such alternatives.

In sum, the court recommends that summary judgment be granted in Defendants' favor as to his claim that he was retaliated against when he was transferred to HDSP.

## C. First Amendment Free Exercise Clause and RLUIPA

### 1. Clarification Regarding Religious Claims

In his opposition, Plaintiff includes an argument that his First Amendment rights and rights under RLUIPA were violated by the flattening of the pagan religious grounds at LCC in October 2009; however, the allegations of Plaintiff's complaint were not construed by the court on screening as stating such a claim. Rather, the screening order states: "The complaint otherwise states a claim under the First Amendment and RLUIPA based upon allegations that plaintiff was retaliated against for filing the grievances and due to his pagan faith and under the Equal Protection Clause for alleged discrimination against those of pagan faith." (Doc. # 7 at 4:25-28.) Another review of the complaint further reveals that the fact that the pagan grounds were flattened was included as background information leading to the allegations of retaliation

21

and related claims that his First Amendment rights and rights under RLUIPA were violated. (Doc. # 1-1 at 13-24.) This is evidenced by the fact that the flattening is only discussed in the first paragraph of the complaint, and the remaining allegations pertain to the filing of grievances, the disciplinary action taken against Plaintiff, and eventual transfer to HDSP. (*Id.*)

Therefore, Defendants have appropriately moved for summary judgment on these claims insofar as they are based on the allegations that he was retaliated against for filing grievances and because of his pagan faith. They assert that they are entitled to summary judgment because Plaintiff fails to demonstrate that the enforcement of AR 740 regarding the abuse of the prison grievance process was related to his pagan faith or substantially burdened the free exercise of his beliefs.

### 2. Legal Standard- First Amendment Free Exercise Clause

"The First Amendment, applicable to state action by incorporation through the Fourteenth Amendment...prohibits government from making a law prohibiting the free exercise [of religion]." *Hartmann v. Cal. Dep't of Corr.*, 707 F.3d 1114, 1122 (9th Cir. 2013) (internal quotation marks and citations omitted) (alteration original). "[P]risoners retain the protections of the First Amendment." *Id.* (citing *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348 (1987); *Pell v. Procunier*, 417 U.S. 817, 822 (1974); *Cruz v. Beto*, 405 U.S. 319, 322 (1972)). To implicate the Free Exercise Clause, the prisoner must establish a sincerely held and rooted religious belief. *See Shakur v. Schriro,* 514 F.3d 878, 884-85 (9th Cir. 2008).

To prevail on his Free Exercise claim, Plaintiff must also establish that he was denied "a reasonable opportunity [of] pursuing [his] faith comparable to the opportunity afforded fellow prisoners who adhere to conventional religious precepts.'" *Hartmann*, 707 F.3d at 1122 (quoting *Cruz*, 405 U.S. at 322).

"A prisoner's right to freely exercise his religion, however, is limited by institutional objectives and by the loss of freedom concomitant with incarceration." *Hartmann*, 707 F.3d at 1122 (citing *O'Lone*, 482 U.S. at 348); *see also McElyea v. Babbitt*, 833 F.2d 196, 197 (9th Cir. 1987) (citations omitted) ("The free exercise right, however, is necessarily limited by the fact of incarceration, and may be curtailed in order to achieve legitimate correctional goals or to maintain prison security."). In analyzing the legitimacy of regulation of an inmate's religious expression, the court utilizes the *Turner* factors (set forth above in the court's analysis of Plaintiff's retaliation claims). *See O'Lone*, 482 U.S. at 349.

### 3. Legal Standard- RLUIPA

Section 3 of RLUIPA provides: "[n]o government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution...even if the burden results from a rule of general applicability," unless the government shows that the burden is "in furtherance of a compelling government interest" and "is the least restrictive means of furthering...that interest." 42 U.S.C. § 2000cc-1(a). "Court are expected to apply RLUIPA's standard with 'due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources." *Hartmann*, 707 F.3d at 1124 (internal quotation marks and citation omitted).

Under RLUIPA, the plaintiff "bear[s] the initial burden of persuasion on whether [a policy] 'substantially burdens' their 'exercise of religion.'" *Hartmann*, 707 F.3d at 1124 (citing 42 U.S.C. § 2000cc-1(a)). "Religious exercise" is "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." *Id.* (citing 42 U.S.C. § 2000cc-5)(7)(A). A "substantial burden" on "religious exercise" "must impose a significantly great restriction or

onus upon such exercise." *Id.* (quoting *San Jose Christian Coll. V. City of Morgan Hill*, 360 F.3d 1024, 1034 (9th Cir. 2004)). "In the context of a prisoner's constitutional challenge to institutional policies, [the Ninth Circuit] has held that a substantial burden occurs 'where the state...denies [an important benefit] because of conduct mandated by religious belief, thereby putting substantial pressure on the adherent to modify his behavior and to violate his beliefs." *Id.* at 1125 (quoting *Warsoldier v. Woodford*, 418 F.3d 989, 995 (9th Cir. 2005)) (internal quotation marks omitted).

### 4. Analysis

Defendants argue that Plaintiff has not alleged specific wrongful conduct which impermissibly infringed upon the free exercise of Plaintiff's religion. (Doc. # 35 at 10.) Defendants assert that insofar as Plaintiff infers that AR 740—which contains the provision regarding abuse of the grievance process—unreasonably restricted his First Amendment right to the free exercise of his pagan religious beliefs, he cannot show that AR 740 substantially burdened the free exercise of his religious beliefs. (*Id.*) Instead, Defendants claim their actions were based on valid interests that were rationally related to the regulations and penological goals of the institution. (*Id.* at 11.)

Defendants similarly argue with respect to RLUIPA that Plaintiff fails to demonstrate how Defendants' conduct substantially burdened his ability to exercise his pagan beliefs and as such they are entitled to summary judgment on this claim. (Doc. # 35 at 11-12.)

Plaintiff asserts that Defendants knew that the protective segregation worship area at LCC is the only available space for pagan services, and then a good portion of these grounds were destroyed in the sealing project undertaken by LCC. (Doc. # 40 at 18.) Plaintiff also states that once he was transferred to HDSP, he had no ability to practice his faith under his

classification status. (Doc. # 40 at 19.) As a result, he contends a substantial burden was placed on his ability to exercise his religious beliefs. (*Id*. at 19-20.)

Plaintiff incorporates the argument he asserted with respect to his claim under the Free Exercise Clause in his opposition to the motion for summary judgment on the RLUIPA claim.

The court agrees with Defendants that there is no evidence that Defendants actions in subjecting him to disciplinary action after he and a group of inmates inundated LCC staff with grievances or in transferring him to HDSP denied him a reasonable opportunity to pursue his faith or substantially burdened his ability to exercise his pagan beliefs.

While Plaintiff states that he was denied access to pagan religious grounds at HDSP, and has provided a document from the HDSP Warden confirming this, there is no evidence that the defendants in *this* action substantially burdened his ability to exercise his pagan beliefs. As the court indicated above, Plaintiff speculates that these defendants knew he would not have access to pagan grounds at HDSP but provides no evidence to support his conjecture.

Therefore, the court recommends that summary judgment be granted in favor of Defendants on Plaintiff's Free Exercise and RLUIPA claims.

**E. Equal Protection**

"The Equal Protection Clause requires the State to treat all similarly situated people equally." *Hartmann*, 707 F.3d at 1123 (citing *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985)). "This does not mean, however, that all prisoners must receive identical treatment and resources." *Id*. (citations omitted). To prevail on an Equal Protection Claim brought under §1983, an inmate must establish that the defendants "acted with an intent or purpose to discriminate [against him] based upon membership in a protected class." *Id*. (internal quotation marks and citation omitted).

Plaintiff asserts that as a practicing pagan inmate he belongs to a protected class and that he was intentionally discriminated against based on his membership in this class. (Doc. # 40 at 23-24.) Plaintiff alleges that the disciplinary action taken against him and the act of transferring him from LCC to HDSP were done with discriminatory intent towards pagan inmates, in violation of the Equal Protection Clause.

Defendants argue there is no evidence of discriminatory intent. Instead, they maintain that disciplinary action was taken against Plaintiff and he was transferred from LCC because the coordinated effort among the group of inmates posed a safety and security risk. (Doc. # 35 at 13-14.)

There is no evidence before the court that Plaintiff was discriminated against, either in the disciplinary action initiated against him or his transfer to ESP, based upon his pagan religious affiliation. While it is true that the group of inmates who filed a number of grievances following the flattening of the religious grounds were pagans, there is no indication that they were subject to disciplinary action or transferred to another facility *because of* their religious affiliation. There is simply no evidence whatsoever of discriminatory intent.

Plaintiff also mentions being classified as a member of a security threat group (STG) and that having an implication on his equal protection claim; however, as Defendants' correctly point out, plaintiff was not classified as a member of a STG. (Doc. # 35-34.)

In sum, summary judgment should be granted in favor of Defendants on Plaintiff's equal protection claim.

///

///

///

26

**F. Other Federal Claims**[5]

Plaintiff is correct that he included claims under 42 U.S.C. § 1985 (conspiracy) and 42 U.S.C. § 1986 in his complaint. The screening order did not specifically address these claims, but stated: "All other claims not expressly dismissed above, including pendent state law claims, remain before the Court." (Doc. # 7 at 5.) Defendants' motion does not address these claims. Nevertheless, the court recommends that these claims be dismissed with prejudice for failure to state a claim upon which relief may be granted.

42 U.S.C. § 1985 contains the elements of a claim for conspiracy to interfere with a person's civil rights. The court has recommended that summary judgment be granted in favor of Defendants as to all of Plaintiff's underlying constitutional claims; therefore, he cannot maintain a claim that defendants conspired to violate his constitutional rights based on the same facts.

42 U.S.C. § 1986 "authorizes a remedy against state actors who have negligently failed to prevent a conspiracy that would be actionable under § 1985." *Cerrato v. S.F. Cmty. Coll. Dist.*, 26 F.3d 968, 971 n. 7 (9th Cir. 1994). "A claim can be stated under [§] 1986 only if the complaint contains a valid claim under [§] 1985." *Karim-Panahi v. L.A. Police Dep't*, 839 F.2d 621, 626 (9th Cir. 1988); *see also Sanchez v. City of Santa Ana*, 936 F.2d 1027, 1040 (9th Cir. 1991). Because the court has recommended that summary judgment be granted in Defendants' favor as to each of the underlying constitutional claims, and that the conspiracy claim under § 1985 be dismissed, the court also recommends that the claim under § 1986 be dismissed with prejudice.

///

///

---

[5]  Defendants include a reference to procedural due process claims (Doc. # 35 at 12-13), and are correct that any such claims were dismissed with prejudice on screening. (*See* Doc. # 7.)

**G. State Law Claims**

Plaintiff is correct that Defendants' motion did not mention the state law claims; however, the court recommends that it decline to exercise supplemental jurisdiction under 28 U.S.C. § 1367 over Plaintiff's state law claims because it has recommended dismissal of all other claims over which it has original jurisdiction. *See* 28 U.S.C. § 1367(c)(3).

## IV. RECOMMENDATION

**IT IS HEREBY RECOMMENDED** that the District Judge enter an order:

(1) **GRANTING** Defendants' motion for summary judgment (Doc. # 35);

(2) **DENYING** Plaintiff's request for a delay in considering Defendants' motion under Federal Rule of Civil Procedure 56(d);

(3) **DISMISSING WITH PREJUDICE** Plaintiff's remaining federal claims under 42 U.S.C. § 1985 and 42 U.S.C. § 1986; and

(4) **DECLINING** to exercise supplemental jurisdiction over Plaintiff's state law claims.

///

//

///

///

///

///

///

///

///

The parties should be aware of the following:

1.That they may file, pursuant to 28 U.S.C. § 636(b)(1)(C) and Rule IB 3-2 of the Local Rules of Practice, specific written objections to this Report and Recommendation within fourteen (14) days of receipt. These objections should be titled "Objections to Magistrate Judge's Report and Recommendation" and should be accompanied by points and authorities for consideration by the District Court.

2. That this Report and Recommendation is not an appealable order and that any notice of appeal pursuant to Rule 4(a)(1) of the Federal Rules of Appellate Procedure should not be filed until entry of the District Court's judgment.

**DATED:  January 13, 2014.**


_____
**WILLIAM G. COBB**
**UNITED STATES MAGISTRATE JUDGE**