UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| BRIAN JOEL DEBARR, | Case No. 3:12-cv-00039-LRH-WGC |
| Plaintiff, | **REPORT & RECOMMENDATION OF U.S. MAGISTRATE JUDGE** |
| v. | |
| STEPHAN CLARK, *et al.*, | |
| Defendants. | |

This Report and Recommendation is made to the Honorable Larry R. Hicks, Senior United States District Judge. The action was referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and the Local Rules of Practice, LR 1B 1-4.

Before the court is Defendants Renewed Motion for Summary Judgment Based on Qualified Immunity. (ECF Nos. 104; exhibits at 105, 106, 107, 125; 116[1]; 124[2].) Plaintiff filed a response. (ECF No. 129, 130 (appendix of exhibits).) Defendants filed a reply. (ECF No. 131.)

After a thorough review, the court recommends that Defendants' motion be denied.

## I. BACKGROUND

Plaintiff is an inmate in the custody of the Nevada Department of Corrections (NDOC), who filed this action concerning events that took place while Plaintiff was housed at Lovelock Correctional Center (LCC) in the Sixth Judicial District Court of the State of Nevada, in and for the County of Pershing, on December 21, 2011. (ECF No. 1-1.) Defendants removed the action to federal court on January 20, 2012. (ECF No. 1.)

Defendants are Tara Carpenter, Ellie Emmanuel, Don Helling, Jack Palmer, Kirk Widmar, and Greg Cox. (*See* Screening Order, ECF No. 7.) Defendant Stephen Clark was

---

[1]

ECF No. 116 is a notice of supplemental authority in support of Defendants' motion.

[2]

ECF No. 124 is a notice of the manual filing of two CDs containing audio recordings of disciplinary hearings.

dismissed without prejudice pursuant to a stipulation between the parties. (ECF Nos. 102, 103.)[3]

In his complaint, Plaintiff alleges that he is a member of the Pagan faith group at LCC and in January 2009, he and other Pagan faith group members were informed that part of the land authorized for use by the Pagans at LCC would be flattened in connection with construction projects on buildings, including housing units 3A and 3B. He claims that the area initially identified by the LCC administration as being impacted did not include the sacred portions of the Pagan grounds, so the Pagans made preparations to accommodate the construction project. He claims that on October 21, 2009, instead of flattening only a portion of the grounds, the entirety of the grounds behind units 3A and 3B were flattened.

After learning of the destruction of the grounds, he contends that he filed multiple grievances, containing one issue per grievance, as is required under Administrative Regulation (AR) 740. He subsequently received a notice of charges for abuse of the inmate grievance process. He was convicted and sentenced to fifteen days in disciplinary segregation. He claims that he was identified as one of a group of Pagan inmates who submitted multiple grievances regarding destruction of the grounds and it was recommended that he be transferred to the allegedly more secure and less desirable High Desert State Prison (HDSP). He was transferred to HDSP on January 13, 2010, and was ultimately transferred back to LCC in July 2011.

On screening, Plaintiff was allowed to proceed with the following claims based on those facts: (1) retaliation for filing grievances; (2) claims under the First Amendment's Free Exercise Clause and the Religious Land Use and Institutionalized Persons Act (RLUIPA), 42 U.S.C. § 2000-cc(1); (3) an Equal Protection Clause claim for alleged discrimination against

---

[3]

Even though Clark was dismissed from the action without prejudice, Defendants state in two footnotes that he nevertheless joins in their motion and reply. (ECF No. 104 at 1, n. 1, ECF No. 131 at 1, n. 1.) Mr. Clark cannot join in a motion for summary judgment if he is not a party, and he was dismissed pursuant to stipulation. Defendants intent in including Mr. Clark appears to be to preclude Plaintiff from renewing the action against Mr. Clark if the other Defendants are found to be entitled to qualified immunity, as they argue that Mr. Clark would similarly be entitled to qualified immunity. If Mr. Clark wanted to make the argument of qualified immunity, he should have remained a party. As a practical matter, if the court were to find the current defendants are entitled to qualified immunity, it is unlikely Plaintiff would reinitiate the action against Mr. Clark.

those of the Pagan faith. (ECF No. 7.) The Screening Order did not address the viability of the State law claims or the federal conspiracy claim brought pursuant to 42 U.S.C. §§ 1985, 1986.

On June 10, 2013, Defendants filed their initial motion for summary judgment, arguing that the disciplinary action taken against Plaintiff and his transfer to HDSP were based on legitimate penological reasons, and not because of Plaintiff was filing grievances or because of his Pagan beliefs. (ECF No. 35.) On January 13, 2014, the undersigned recommended that insofar as Plaintiff's response to the motion contained a request under what is now Federal Rule of Civil Procedure 56(d), there were insufficient grounds for allowing Plaintiff to conduct further discovery. (ECF No. 48.) The undersigned further recommended that Defendants motion be granted. (ECF No. 48.) On March 7, 2014, District Judge Larry R. Hicks adopted and accepted the report and recommendation. (ECF No. 53, 64.[4]) Plaintiff appealed the order on March 14, 2014. (ECF Nos. 54, 65.)

On March 2, 2016, the Ninth Circuit Court of Appeals issued a memorandum reversing and remanding the grant of summary judgment in favor of Defendants.[5] The appellate court concluded that the district court erred "by concluding that the evidence presented no genuine issue of material fact as to whether Plaintiffs abused the prison grievance process." (ECF No. 70 at 3.) The Ninth Circuit found that the "evidence, when viewed in the light most favorable to Plaintiffs, shows that they had engaged in the prison's informal resolution procedure before filing their grievances, that their grievances were not frivolous, vexatious or duplicative, and that the Defendants failed to follow their own mandated procedures in punishing Plaintiffs." (*Id.*) While Defendants argued that AR 740 forbids the filing of duplicative grievances, the Ninth

---

[4] In this order, Judge Hicks determined that the state law claims should not be remanded to state court, but failed for the same reasons as Plaintiff's federal law claims.

[5] The Ninth Circuit consolidated this case on appeal with *Gadsden v. Carpenter,* 3:12-cv-00098-RCJ-VPC (now 3:12-cv-00098-MMD-VPC). While Plaintiff's counsel indicated at a post-remand status conference that he would likely seek an order consolidating the cases at the district court level (*see* minutes at ECF No. 84), a motion to consolidate was never filed. It should be noted that in *Gadsden,* District Judge Du denied the defendants' motion to file a renewed motion for summary judgment based on qualified immunity because they sought to file the motion after the expiration of the dispositive motion deadline and did not establish good cause to justify an order allowing the untimely filing of the motion. (*See* ECF No. 131 in 3:12-cv-00098-MMD-VPC.) Defendants' motion in this case was timely filed.

Circuit pointed out that "AR 740 only limits the number of 'unfounded frivolous or vexatious grievances,' a disputed issue in this case." (*Id*.) The Ninth Circuit also concluded that the district court abused its discretion in denying the request for a continuance of summary judgment pending further discovery under Federal Rule of Civil Procedure 56(d), and stated that on remand Plaintiffs should be allowed to pursue discovery. (*Id*. at 4.)

On remand, consistent with the Ninth Circuit's order, the undersigned directed the parties to meet and confer concerning what discovery needed to be undertaken, and subsequently reopened discovery and modified the scheduling order. (*See* ECF Nos. 84, 88.)

On December 12, 2016, Defendants filed their Renewed Motion for Summary Judgment Based on Qualified Immunity. Defendants argue that they did not violate Plaintiff's constitutional rights, and even when considered in the light most favorable to Plaintiff, the facts show no violation of a constitutional right clearly established in law at the time the conduct occurred. Plaintiff, on the other hand, argues that Defendants are merely attempting to rehash their motion for summary judgment on the merits, when the Ninth Circuit already determined there was a genuine dispute of material fact precluding summary judgment in Defendants' favor. He further argues that Defendants were on clear notice that their conduct violated Plaintiff's constitutional rights.

## II. DISCUSSION

### A. Qualified Immunity

"'In determining whether an officer is entitled to qualified immunity, we consider (1) whether there has been a violation of a constitutional right; and (2) whether that right was clearly established at the time of the officer's alleged misconduct.'" *Ames v. King County, Washington*, 846 F.3d 340, 347 (9th Cir. 2017) (quoting *Lal v. California,* 746 F.3d 1112, 1116 (9th Cir. 2014)). The court may use its discretion to determine which of the prongs to address first. *Id*.

"Qualified immunity attaches when an official's conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *White v. Pauly*, 137 S.Ct. 548, 551 (2017) (quoting *Mullenix v. Luna*, 136 S.Ct. at 308). A case

directly on point is not required for a right to be clearly established, but "'existing precedent must have placed the statutory or constitutional question beyond debate.'" *Id.* "In other words, immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Id.*

"'[C]learly established law' should not be defined 'at a high level of generality.'" *Id.* at 552 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011)). "[T]he clearly established law must be 'particularized' to the facts of the case." *Id.* (citing *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). "Otherwise, '[p]laintiffs would be able to convert the rule of qualified immunity … into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights.'" *Id.* (quoting *Anderson*, 483 U.S. at 639).

**B. Was There a Violation of a Constitutional Right?**

First, the court will address whether there has been a violation of a constitutional right.

Preliminarily, Plaintiff claims that Defendants' motion simply rehashes its earlier motion for summary judgment on the merits, the granting of which was reversed by the Ninth Circuit. It is true that many of Defendants' arguments are similar to those raised in the original motion, but in arguing they are entitled to qualified immunity, Defendants are permitted to argue that there was no violation of a constitutional right. *See Sorrels v. McKee,* 290 F.3d 965, 969 (9th Cir. 2002) (explaining that the rights-violation prong of the qualified immunity analysis "mirrors the substantive summary judgment decision on the merits"). Therefore, the court does not find Defendants' motion should be denied on this basis.

As will be discussed in detail below, even after discovery was reopened pursuant to the Ninth Circuit's direction, factual disputes still remain concerning whether there was a violation of Plaintiff's constitutional rights, and viewing the facts in the light most favorable to Plaintiff, a reasonable fact-finder could conclude his constitutional rights were violated. *See Chappell v. Mandeville*, 706 F.3d 1052, 1057 (9th Cir. 2013) (citations omitted) (when the court conducts a qualified immunity analysis, it must view the facts in the light most favorable to the plaintiff).

Preliminarily, the following general facts are undisputed: during the relevant time period, Plaintiff was an inmate housed in LCC's protective custody (PC) unit, and designated his faith group as Pagan. The Pagan inmates utilized an area outside the buildings that housed the PC

inmates for worship. At some point in 2009, the Pagans were informed that the prison would need to do some work to the exterior of the housing units adjacent to the Pagan grounds.

On October 20, 2009, the exterior work was performed and resulted in the flattening of the Pagan grounds.

After they observed the flattening of the grounds, Plaintiff and fourteen other Pagan inmates each submitted twenty-one grievances about various issues concerning the PC Pagan inmates. Emmanuel consulted with Palmer, and prepared a memorandum for Helling, recommending that the inmates be served with a notice of charges for abuse of the prison grievance process. Helling agreed with the recommendation and the inmates, including Plaintiff, were served with the notice of charges. A disciplinary hearing was held with Widmar serving as the assigned disciplinary hearing officer. Plaintiff pled not guilty to the charge. Plaintiff gave a statement explaining that his intent in filing the grievances in that manner was to exhaust his administrative remedies prior to filing a lawsuit. He was ultimately convicted of the charge and sentenced to fifteen days in disciplinary segregation. He was also transferred to HDSP.

**1. Retaliation**

"Section 1983 provides a cause of action for prison inmates whose constitutionally protected activity has resulted in retaliatory action by prison officials." *Jones v. Williams*, 791 F.3d 1023, 1035 (9th Cir. 2015). Such a claim consists of the following elements: (1) an assertion that a state actor took some adverse action against an inmate; (2) because of; (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal.

*Jones,* 791 F.3d at 1035 (quoting *Rhodes v. Robinson*, 408 F.3d 559, 567-68 (9th Cir. 2005)). "The First Amendment guarantees a prisoner a right to seek redress of grievances from prison authorities as well as a right of meaningful access to the courts." *Id.* (citation omitted).

An inmate must submit evidence, either direct or circumstantial, to establish a link between the exercise of constitutional rights and the allegedly retaliatory action. *Pratt v. Rowland*, 65 F.3d 802, 806-07 (9th Cir. 1995). The plaintiff "need only 'put forth evidence of retaliatory motive, that, taken in the light most favorable to him, presents a genuine issue of

material fact as to [the defendant's] intent[.]'" *Brodheim v. Cry*, 584 F.3d 1262, 1271 (9th Cir. 2009) (quoting *Bruce v. Ylst,* 351 F.3d 1283, 1289 (9th Cir. 2003)). Restated, in order to raise a triable issue as to motive, the plaintiff must offer "either direct evidence of retaliatory motive or at least one of three general types of circumstantial evidence [of that motive]." *McCollum v. Ca. Dep't of Corr. and Rehab.*, 647 F.3d 870, 882 (9th Cir. 2011) (citation and quotation marks omitted). Circumstantial evidence may include: "(1) proximity in time between protected [activity] and the alleged retaliation; (2) [that] the [defendant] expressed opposition to the speech; [or] (3) other evidence that the reasons proffered by [the defendant] for the adverse … action were false and pretextual." *Id*. (internal citation and quotation marks omitted).

Defendants do not contest that adverse action was taken against Plaintiff. Nor do they make an argument concerning the chilling of Plaintiff's First Amendment rights. Instead, they argue that Plaintiff cannot establish he was retaliated against when he was subject to disciplinary sanctions following the grievance incident because he cannot demonstrate he was punished because he engaging in protected activity. They maintain that he was disciplined for conspiring with other inmates in an organized, group protest. In addition, they contend that Plaintiff cannot establish that Defendants' conduct did not reasonably advance the legitimate correctional goals of safety and security of the institution when faced with this coordinated effort among the fourteen inmates. Plaintiff, on the other hand, argues that the evidence reveals that he was punished not for conspiring to create an organized group protest, but for filing grievances.

Insofar as Defendants argue that Plaintiff was not punished for engaging in First Amendment activity, but for conspiring with other inmates in an organized group protest, they contend that Plaintiff admits that NDOC prohibits the filing of a petition.

The court notes, however, that Plaintiff was not charged with filing a petition, but with abuse of the grievance process. While Plaintiff admits that he knew inmates were not allowed to file a petition, he went on to testify that is not what he and the other inmates were doing. (Pl. Decl., ECF No. 129 at ¶¶ 13, 14.) He insists they were following the rules by filing one issue per grievance so they could exhaust their administrative remedies before filing a lawsuit. (*See* Pl.'s Depo., ECF No. 105 at 19, pp. 60:8-12, 60:21-25; Pl.'s Decl., ECF No. 129 at 19 ¶ 14.) Plaintiff

- 7 -

explains that they did not want to have an issue with an inmate who was part of the group not being able to pursue a claim in the lawsuit for failure to exhaust administrative remedies; therefore, they exchanged a document between themselves where each person wrote out the issues they thought should be included (in the lawsuit), and using that document agreed on twenty-one issues for which each inmate needed to file a grievance. (Pl.'s Decl., ECF No. 129 at 19 ¶ 15.) Plaintiff states that the issues were mainly about the treatment of the PC Pagan inmates that had been raised informally previously with the chaplain and caseworkers, and the inmates doubted the issues would be resolved through the prison grievance process. (*Id*.)

Defendants rely on *May v. Libby*, 256 Fed.Appx. 825 (7th Cir. 2007) and *Peck v. Nevin*, 2:13-cv-0782-GMN-CWH, 2014 WL 4829621 (D. Nev. Sept. 29, 2014) to support their argument that inmates may be punished for this sort of conduct.

Preliminarily, the court is not bound by an unpublished Seventh Circuit decision. Insofar as it may serve as persuasive authority, *May* is distinguishable from this case. *May* involved the internal affairs department of the prison receiving ten grievances about prison conditions that purported to be from ten different inmates, but were in the same handwriting and nearly identical in content, and each asked that May act as their representative. *May*, 256 Fed.Appx. at 827. The prison interpreted the grievances to be a petition, in violation of the prison's regulations. *Id*. Prison officials searched May's cell, and confiscated the grievance form and removed legal documents. *Id*. May alleged that confiscating the grievance form was done in retaliation for using the grievance process. *Id*. The district court granted the defendants' motion for judgment as a matter of law at trial, finding that the search of the cell and confiscation of the grievance form was reasonably related to penological interests. *Id*. at 827-28. The Seventh Circuit concluded that the *undisputed* evidence that the documents were in the same handwriting, worded identically, and designated May as the representative, supported the defendants' explanation that the cell was searched not because May filed grievances concerning prison conditions but because he circulated a petition. *Id*. The court stated that "[b]anning petitions to maintain control over group activity by prisoners is a reasonable response to a legitimate penological concern." *Id*. (citations omitted).

Here, the grievances were not in the same handwriting, and while they had the same content, none of the inmates asked for Plaintiff to be their representative. In addition, there was no finding by prison officials here that the grievances constituted a petition. Instead, Emmanuel wrote a memorandum to Helling that described the action as intending to harass and an abuse of the prison grievance process. The memorandum does not make reference to a petition. She recommended that a notice of charges be issued for abuse of the grievance procedure, not for filing a petition, and Helling accepted this recommendation. Plaintiff was charged with abuse of the prison grievance procedure, not for filing a petition. Moreover, the appellate court in *May* found that May had not submitted evidence to dispute the evidence proffered by the defendants that their action was in response to a legitimate penological concern. Here, Plaintiff has submitted evidence to dispute Defendants' claim that their action was in response to the safety and security concerns posed by the coordinated effort of Plaintiff and the fourteen other inmates in filing the grievances.

*Peck* is also distinguishable. In *Peck*, the plaintiff alleged he was retaliated against for filing a grievance against the law library supervisor at HDSP. *Peck*, 2014 WL 4829621, at * 1. In that case, a cell search was conducted and nine boxes containing legal files were removed from Peck's cell and not returned until the next day. *Id*. In the motion to dismiss, the defendants asserted that the cell was searched as part of an effort to prevent a security brief after they had received identical grievances from ten inmates, including Peck. *Id*. at * 3. In the complaint, Peck claimed this was just a ruse. *Id*. The court found that it was "undisputed" that a valid security risk existed in Peck's unit at the time of the search, regardless of whether Peck was involved in the submission of the set of grievances. *Id*. As a result, the court found Plaintiff did not adequately allege that the action taken did not reasonably advance a legitimate correctional goal.

*Peck* was decided in the context of a motion to dismiss, where apparently the facts were undisputed. Here, there are competing versions of the facts on summary judgment specifically concerning whether Plaintiff was retaliated against because of his protected activity and whether the conduct advanced a legitimate correctional goal.

Next, in support of his claim that he was punished for filing grievances, Plaintiff states that he was aware of AR 740's prohibition on the filing of "vexatious grievances"—those submitted "to agitate, harass or irritate by petty provocations" and "not designed to lead to any practical result." (Pl.'s Decl., ECF No. 130 at 9 ¶ 17.) In light of this, Plaintiff submitted kites to Mr. Harkreader and Ms. Emmanuel, informing them that he was filing multiple grievances concerning his faith, and that he did not intend the grievances to be malicious or vexatious, but was filing them in this manner to comply with AR 740's requirement that each grievance of an issue be filed separately, and to exhaust administrative remedies before filing a lawsuit. (*Id*. ¶ 18; ECF No. 130 at 21-22.) Plaintiff noted in the kites that he had to go through each stage of the grievance process to exhaust his administrative remedies unless the prison would agree to waive any claims against exhaustion. (*Id*.)

While Ms. Emmanuel and others testified in connection with this litigation that this was a manipulative effort to try to justify the abusive grievance process, taking the facts in the light most favorable to Plaintiff, his testimony on this issue creates a dispute of fact as to whether Plaintiff was punished for filing grievances in order to exhaust his administrative remedies or for abusing the grievance process by harassing staff with a coordinated filing of hundreds of grievances.

As evidence of the harassing nature of the filing of the grievances, Defendants point to testimony that there was a group of inmates laughing when Caseworker Belanger picked up the stack of grievances. In response, Plaintiff indicates that he was not one of those inmates, and there is no evidence that any of the Pagan inmates involved in filing the grievances were present. (Pl. Decl., ECF No. 130 at 14 ¶ 31.) He also asserts that there is no actual evidence that Plaintiff or any of the other inmates involved in filing the grievances informed the group of inmates who were purportedly laughing about the submission of the grievances. Therefore, there is a dispute of fact here as well.

Defendants also rely on the fact that the grievances pertained to issues that occurred much earlier and should have been resolved through kites or religious accommodation processes as evidence of Plaintiff's and the other inmates' improper motive in filing the grievances.

Plaintiff, on the other hand, asserts that the issues raised in the grievances (with the exception of destruction of the Pagan grounds) had been previously addressed in kites or through the religious accommodation process, including discussions with the chaplain and caseworkers, and written requests to the religious accommodations committee. (Pl. Decl., ECF No. 130 at 14 ¶ 32.) Plaintiff also points to a kite he sent to Director Skolnik requesting assistance in resolving an issue regarding the treatment of Pagan inmates at LCC, to which he received a response advising him to utilize the prison grievance procedure to resolve issues, and if unsuccessful, for the exhaustion of administrative remedies as a predicate to litigation. (Pl. Decl., ECF No. 130 at 11 ¶ 21.)

While Defendants argue that Plaintiff was not disciplined because he filed grievances, but for the manner in which the grievances were filed which constituted an abuse of the grievance process, Plaintiff points out that AR 740 provides that an inmate who is found to abuse the prison grievance process is to be given NDOC Form 3098 as a sort of warning or safe harbor prior to being disciplined, and it is undisputed he never received this form. (Pl.'s Decl., ECF No. 129 at 10 ¶¶ 19, 20; ECF No. 35-28 at 10; ECF No. 104 at 9.) Defendants contend that under AR 707, the failure to follow a regulation does not mean an inmate may not still be given a notice of charges for a disciplinary regulation. In addition, Emmanuel testified that the improper grievance form was not generally used at LCC because Warden LeGrand preferred for grievances to be answered. (Emmanuel Depo., ECF No. 105 at 145, depo. pp. 52:15-20, 53:1, 76:1-18, 79:13-16.) Plaintiff disputes this was the case, indicating that he received the Form 3098 for unrelated grievances on October 21, 2009 and December 21, 2009, with the latter being sent to him by Ms. Emmanuel. (Pl. Decl., ECF No. 130 at 10 ¶ 20; ECF No. 130 at 24-25.)

Defendants then argue that the evidence establishes that the inmates' actions resulted in harassing the staff at LCC, and given the coordinated effort of the inmates, NDOC was rightfully concerned about safety and security of the institution. Defendants maintain that the filing of hundreds of grievances at once overwhelmed staff, and was evidence of a concerted effort among these inmates which had the potential to develop into a security issue.

Again, Plaintiff presents evidence that he and the other Pagan inmates involved informed Ms. Emmanuel and others that they did not intend to harass or be vexatious, but were trying to exhaust their administrative remedies before filing suit, which raises a factual dispute as to whether the action taken against Plaintiff was in response to a legitimate correctional goal of safety and security or to punish for filing grievances.

Plaintiff also points out that Widmar told him he would not be able to present witnesses at his disciplinary hearing. Instead, Widmar said he could pose questions to defendant Helling, which he did, but received no responses. Instead, he was merely given a copy of Ms. Emmanuel's November 3, 2009 memorandum to Helling, which recommended that the inmates be served with a notice of charges for abuse of the prison grievance process. (Pl. Decl., ECF No. 130 at 12-13 ¶¶ 25, 26.) Plaintiff maintains that this memorandum did not answer the questions he had posed to Helling. (Pl. Decl., ECF No. 130 at 13 ¶ 27.) Plaintiff also takes issue with some of the statements made in Ms. Emmanuel's memorandum. (Pl. Decl., ECF No. 130 at 13-14 ¶ ¶ 27-33.) This is additional circumstantial evidence sufficient to create a disputed issue of fact regarding whether Defendants punished Plaintiff for filing grievances or related to legitimate safety concerns.

Plaintiff further contends that he was sentenced to punishment for abuse of the grievance procedure without a basis for such punishment in the governing regulation, AR 740.

Plaintiff claims that on the morning of his disciplinary hearing, December 15, 2009, prison staff told him, before the hearing had even taken place, that he would be sent to disciplinary segregation after the hearing. (Pl. Decl., ECF No. 130 at 15 ¶ 34.) When he arrived for the hearing, security staff were already there waiting to take him to disciplinary segregation. (*Id*.) In addition, he advised Widmar that his intent in filing the grievances was not to harass, but to exhaust his administrative remedies before filing a lawsuit, and that he had advised Ms. Emmanuel and  Mr. Harkreader of this. (Pl. Decl., ECF No. 130 at 15 ¶ 36.) He also advised Widmar of his position that if prison officials thought he was abusing the grievance process by filing the grievances in that manner, that he should have been provided with Form 3098, but he never received that form. (Pl. Decl., ECF No. 130 at 15 ¶ 36.) Plaintiff contends that Widmar

told him he was issued the notice of charges not for filing the grievances, but because they were filed as a group, and that Form 3098 is only required when an individual files a grievance violating AR 740, not when inmates file grievances as a group. Plaintiff points out that Widmar but did not refer to any provision in AR 740 that supported his position that Plaintiff did not have to be provided with Form 3098 when he was being served with a notice of charges for abuse of the grievance process. (Pl. Decl., ECF No. 130 at 15-16 ¶ 37.) Despite Plaintiff's explanation, Widmar found Plaintiff guilty and sentenced him to fifteen days of disciplinary segregation. (Pl. Decl., ECF No. 130 at 16 ¶ 38.)

Defendants maintain that Plaintiff's transfer was justified because of the safety and security concerns associated with the Pagan inmates' coordinated effort in filing the grievances. They assert that the filing of hundreds of grievances in a short period of time overwhelmed staff and took them away from their other duties. Plaintiff points out that if the grievances were indeed identical, a single response could have been made to one set of grievances and that response could have been copied and sent to all of the inmates. Alternatively, if the prison had issued Form 3098 to the inmates for abuse of the prison grievance procedure, that could have stopped short the influx of grievances as well as the need to provide a substantive response. Finally, Plaintiff states that the prison could have adopted his suggestion to waive the exhaustion defense, thereby obviating the need of the inmates to continue through the grievance process. These statements all serve as evidence to create a genuine dispute of material fact as to why Plaintiff was disciplined.

Plaintiff raises the fact that one of the fifteen Pagan inmates involved was not sentenced to disciplinary segregation. (ECF No. 129 at 15.) That inmate did not deny that he filed the grievances, but advised Widmar that he would withdraw them, stating he no longer wanted anything to do with it, and Widmar dismissed the charges. (*Id.*; ECF No. 130 at 31-35.) Plaintiff argues that this is evidence that the inmates were being punished for filing grievances, since this inmate admitted to filing the grievances, but the charges were dismissed when he agreed to withdraw them.

Plaintiff also claims that he was retaliated against when he was transferred to HDSP. At the end of Plaintiff's fifteen days in disciplinary segregation, he asserts that he was taken to a classification hearing to determine if he could return to his prior unit. (Pl. Decl., ECF No. 130 at 16 ¶ 40.) He says that at that time it was determined he was not a safety and security threat, and was approved for transfer back to his unit. (Pl. Decl., ECF No. 130 at 16 ¶ 40; ECF No. 40 at 82.) That same day, case notes were entered stating: "Inmate is part of a group of P/S inmates who engaged in disruptive behavior at LCC and is completing DS time for this. For the continued safety and security of LCC's P/S units as well as these inmates adjustment, it is best to split up the group. This is not an adverse classification, they are going to the same custody level, PS, at HDSP." (ECF No. 40 at 82.) Plaintiff asserts that the foregoing is evidence that he was transferred for filing grievances. While the notes state that it was not an adverse classification, Plaintiff retorts that he feared being transferred to HDSP because he had past violent incidents with Aryan Warriors, a known prison gang with a substantial presence at HDSP. (Pl. Decl., ECF No. 130 at 17 ¶ 43.)

Ms. Carpenter testified that she participated in making the recommendation that Plaintiff could be safely transferred to HDSP because he would be in protective segregation. Plaintiff states, however, that general population inmates, which include gang members, do have occasional access to protective segregation inmates. (Pl. Decl., ECF No. 130 at 18 ¶ 44.) He states that they became aware of his arrival to HDSP and threatened him several times, causing him to live in fear while he resided at HDSP. (Pl. Decl., ECF No. 130 at 18 ¶ 44.)

This evidence reveals additional disputed facts concerning whether Plaintiff's transfer to HDSP was retaliatory.

While Defendants claim that the coordinated effort of fifteen inmates filing twenty-one grievances presented a safety risk because their conduct could potentially escalate to violence, Plaintiff points out that there was no actual evidence of that happening. Viewed in the light most favorable to Plaintiff, he and the other inmates were upset about the flattening of the Pagan grounds, but acted civilly and according to regulations when they raised their concerns through the grievance procedure in order to exhaust their administrative remedies to file a lawsuit.

In sum, Plaintiff has presented evidence that establishes a genuine dispute of material fact as to whether he was punished for filing grievances, and whether Defendants' conduct was reasonably related to legitimate correctional goals of safety. Therefore, Defendants' motion should be denied insofar as they assert they are entitled to qualified immunity on the retaliation claim because no constitutional violation occurred.[6]

## 2. First Amendment Free Exercise/RLUIPA

### a. The Free Exercise Clause

"The First Amendment, applicable to state action by incorporation through the Fourteenth Amendment, … prohibits government from making a law prohibiting the free exercise [of religion]." *Hartmann v. Cal. Dep't of Corr. & Rehab.*, 707 F.3d 1114, 1122 (9th Cir. 2013) (citations and quotation marks omitted, alteration original). "Inmates retain the protections afforded by the First Amendment, 'including its directive that no law shall prohibit the free exercise of religion.'" *Shakur v. Schriro,* 514 F.3d 878, 883-84 (9th Cir. 2008) (quoting *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348 (1987)).

To implicate the Free Exercise Clause, a prisoner must establish his belief is both sincerely held and rooted in religious belief. *See Shakur*, 514 F.3d at 884-85. The inquiry is not whether a belief is a central tenet of the inmate's religion. *See id.* at 885. Then, "[a] person asserting a free exercise claim must show that the government action in question substantially burdens the person's practice of her religion." *Jones v. Williams*, 791 F.3d 1023, 1031 (9th Cir. 2015) (citation omitted). "'A substantial burden … place[s] more than an inconvenience on religious exercise; it must have tendency to coerce individuals into acting contrary to their religious beliefs or exert substantial pressure on an adherent to modify his behavior and to

---

[6]

Defendants' argue in their reply brief that Plaintiff has not raised a triable issue because his opposition relies on his own self-serving declaration. This argument is unavailing. The Ninth Circuit has acknowledged "that declarations are often self-serving, and this is properly so because the party submitting it would use the declaration to support his or her position." *See Nigro v. Sears, Roebuck and Co.*, 784 F.3d 495, 497 (9th Cir. 2015) (citing *S.E.C. v. Phan*, 500 F.3d 895, 909 (9th Cir. 2007) (holding that district court erred in disregarding declarations as "uncorroborated and self-serving"). "Although the source of the evidence may have some bearing on its credibility, and thus on the weight it may be given by a trier of fact, the district court may not disregard a piece of evidence at the summary judgment stage solely based on its self-serving nature." *Id*.

violate his beliefs.'" *Id*. (quoting *Ohno v. Yasuma*, 723 F.3d 984, 1011 (9th Cir. 2013)).

"The right to exercise religious practices and beliefs does not terminate at the prison door. The free exercise right, however, is necessarily limited by the fact of incarceration, and may be curtailed in order to achieve legitimate correctional goals or to maintain prison security." *McElyea v. Babbit*, 833 F.3d 196, 197 (9th Cir. 1987) (per curiam); *see also O'Lone*, 482 U.S. at 348; *Cruz v. Beto*, 405 U.S. 319, 322 (1972); *Hartmann*, 707 F.3d at 1122; *Shakur*, 515 F.3d at 883-84. The challenged conduct is "valid if it is reasonably related to legitimate penological interests." *O'Lone*, 482 U.S. at 348 (quoting *Turner v. Safley*, 482 U.S. 78, 89 (1987)).

In analyzing the legitimacy of regulation of a prisoner's religious expression, the court is instructed to utilize the reasonableness factors set forth in *Turner v. Safley*. *O'Lone*, 482 U.S. at 349. The *Turner* factors are: (1) "there must be a 'valid, rational connection' between the prison regulation and the legitimate governmental interest put forward to justify it"; (2) "whether there are alternative means of exercising the right that remain open to prison inmates"; (3) "the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally"; (4) the "absence of ready alternatives" and the "existence of obvious, easy alternatives." *Turner*, 482 U.S. at 89-91.

### b. RLUIPA

Section 3 of RLUIPA provides:

> No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution … even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person -- (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc-1(a). "The Supreme Court has recognized RLUIPA as … [a] 'congressional effort[ ] to accord religious exercise heightened protection from government-imposed burdens[.]" *Greene v. Solano County Jail*, 513 F.3d 982, 986 (9th Cir. 2008) (quoting *Cutter v. Wilkinson*, 544 U.S. 709, 714 (2005)).

/ / /

"Under RLUIPA, the challenging party bears the initial burden of proving that his religious exercise is grounded in a sincerely held religious belief …, and that the government's action substantially burdens his religious exercise." *Holt v. Hobbs*, 135 S.Ct. 853, 857 (2015) (citations omitted). "Religious exercise" under RLUIPA is "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc-5(7)(A). Under RLUIPA, the concept of religious exercise "shall be construed in favor of a broad protection of religious exercise, to the maximum extent permitted by the terms of this chapter and the Constitution."

### c. Analysis

Defendants do not argue that Plaintiff's claim fails for lack of a sincerely held religious belief for purposes of the Free Exercise Clause or RLUIPA. Instead, they argue: (1) Plaintiff failed to provide evidence as to how NDOC's actions of charging him with abusing the grievance process, sentencing him to disciplinary segregation or transferring him to HDSP created a substantial burden to his religious practices; and (2) prison security is a compelling government interest. (ECF No. 104 at 23-24.)   In support of their argument they state that Plaintiff conceded he can exercise his religion indoors and has access to the chapel.

Plaintiff contends that because he was kept in disciplinary segregation for fifteen days starting December 16, 2009, he was unable to participate in any ceremonies for the Solstice holiday celebrated by Pagans. (Pl. Decl., ECF No. 130 at 16 ¶ 39.) In addition, Plaintiff asserts that while he was at HDSP, he was denied access to any outdoor area for the practice of his pagan faith. (Pl. Decl., ECF No. 130 at 18 ¶ 45.)

This evidence is sufficient to raise a triable issue as to whether Plaintiff's practice of religion was substantially burdened under the Free Exercise Clause and RLUIPA.

Insofar as Defendants argue that their conduct furthered a compelling government interest, Defendants generally refer to safety and security, presumably referencing the safety and security arguments they made with respect to the retaliation claim, but the court has found that there are factual disputes concerning whether their action was supported by a legitimate correctional goal. Moreover, they do not address whether their conduct was the least restrictive

means of furthering a compelling government interest under RLUIPA. "'The least-restrictive-means standard is exceptionally demanding,' and it requires the government to 'sho[w] that it lacks other means of achieving its desired goal without imposing a substantial burden on the exercise of religion by the objecting part[y.]" *Holt*, 135 S.Ct. at 864 (quoting *Hobby Lobby*, 134 S.Ct. at 2780). Plaintiff has provided evidence that Defendants could have issued a Form 3098, responded to the grievances "en masse" or waived the exhaustion requirement in order to quell what they thought was a coordinated effort resulting in a security threat. This is sufficient to defeat summary judgment on this issue.

Therefore, insofar as Defendants argue there was no constitutional violation for qualified immunity purposes as to Plaintiff's free exercise and RLUIPA claims, their motion should be denied.

### 3. Equal Protection

"The Equal Protection Clause requires the State to treat all similarly situated people equally." *Hartmann*, 707 F.3d at 1123 (citing *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985)). "This does not mean, however, that all prisoners must receive identical treatment and resources." *Hartmann*, 707 F.3d at 1123 (citations omitted). The plaintiff must establish that "the defendants acted with an intent or purpose to discriminate against [him] based upon membership in a protected class." Id. (citations and internal quotation marks omitted).

Defendants argue that Plaintiff has no evidence that he was singled out because of his religion. (ECF No. 104 at 25-26.) Instead, they contend that he was disciplined and transferred because for abusing the grievance process.

As with the other claims, Plaintiff has produced evidence sufficient to raise a genuine dispute of material fact as to whether he was disciplined and transferred because of his religion. Plaintiff states in his declaration that after the destruction of the Pagan grounds, he and the other inmates were upset and tried to discuss the matter with staff, but were essentially told that nothing could be done. (Pl. Decl., ECF No. 130 at 7 ¶¶ 9-11.) This led to the inmates deciding to file a lawsuit and initiating the filing of grievances to exhaust their administrative remedies concerning what they believed to be unfair treatment of Pagan inmates at LCC. (Pl. Decl.,

ECF No. 130 at 8 ¶ 13.) He contends that Ms. Emmanuel immediately responded by preparing a memorandum to Mr. Helling, which Plaintiff maintains did not accurately reflect the situation and left out critical details. (Pl. Decl., ECF No. 130 at 13-14 ¶¶ 27-33.) In addition, Plaintiff points to the fact that he did not receive Form 3098 when Emmanuel herself issued the form to Plaintiff in other instances, as well as the disciplinary hearing, where he was not allowed to call witnesses, his questions to Mr. Helling were not answered, and he believes that his guilt was determined before the hearing. (Pl. Decl., ECF No. 130 at 10 ¶¶ 20, 34, 35.) Finally, he points out that he was transferred to HDSP despite knowledge that there was a gang hostile to him there. (Pl. Decl., ECF No. 130 at 18 ¶ 44.) While Ms. Carpenter testified she did not believe Plaintiff would be in danger because he would be in protective segregation at HDSP, Plaintiff maintains that in reality general population inmates do have occasion access to protective segregation inmates. (*Id.*)

These are disputed facts, and viewed in the light most favorable to Plaintiff, a fact-finder could determine that Plaintiff was treated differently because of his Pagan faith. As a result, insofar as Defendants argue they are entitled to qualified immunity because there was no equal protection violation, their motion should be denied.

## C. Were Plaintiff's Constitutional Rights Clearly Established?

Defendants argue that even if there is a factual question as to whether constitutional violations occurred (as the court has concluded here), they are still entitled to qualified immunity because the constitutional violations of which Plaintiff complained were not clearly established in 2009. They claim that there was no case law in existence in 2009 that would have put them on notice that their actions violated the Constitution. Plaintiff, on the other hand, argues that the law was sufficiently clear to put Defendants on notice that they were violating his rights.

Defendants supplemented their motion with reference to a recent Supreme Court case, *White v. Pauly,* 137 S.Ct. 548 (2017), which addressed the qualified immunity defense in the context of a Fourth Amendment excessive force claim. (ECF No. 116.)

*White* reaffirmed that "[q]ualified immunity attaches when an official's conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would

have known.'" *White*, 137 S.Ct. at 551 (quoting *Mullenix v. Luna,* 136 S.Ct. at 308).). A case directly on point is not required, but "'existing precedent must have placed the statutory or constitutional question beyond debate.'" *Id*. The court took occasion to reiterate that "'clearly established law' should not be defined 'at a high level of generality.'" *Id*. at 552 (quoting *Ashcroft v. al-Kidd,* 563 U.S. 731, 742 (2011). "[T]he clearly established law must be 'particularized' to the facts of the case." *Id.* (citing *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). "Otherwise, '[p]laintiffs would be able to convert the rule of qualified immunity … into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights.'" *Id*.

In *White*, the Supreme Court held that general statements of law concerning excessive force set forth in *Graham v. Connor,* 490 U.S. 386 (1989) and *Tennessee v. Garner*, 471 U.S. 1 (1985), and relied upon by the appellate court in denying qualified immunity, "d[id] not by themselves create clearly established law outside 'an obvious case.'" *Id*. (quoting *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004) (per curiam); *Plumhoff v. Rickard*, 134 S.Ct. 2012, 2023 (2014)). That being said, "general statements of the law are not inherently incapable of giving fair and clear warning to officers, …, but in light of pre-existing law the unlawfulness must be apparent[.]" *Id.* (internal citations and quotation marks omitted).

The Supreme Court concluded that *White* was "not a case where it [wa]s obvious that there was a violation of clearly established law under *Garner* and *Graham*," intimating that the case did not involve a "run-of-the-mill Fourth Amendment violation." *Id*. Instead, the case presented a "unique set of circumstances" as it involved a police officer who arrived late to the scene of ongoing police activity and witnessed shots fired by one of many persons in a house surrounded by officers and then shot and killed an armed occupant of the house without giving a warning first. The Supreme Court noted that clearly established federal law did not "prohibit a reasonable officer who arrives late to an ongoing police action in circumstances like this from assuming that proper procedures, such as officer identification, have already been followed" or requires the officer "to second-guess the earlier steps already taken by his or her fellow officers."

The Ninth Circuit very recently discussed qualified immunity, and specifically the clearly established law component of the defense, post-*White*, in *S.B. v. County of San Diego*, -- F.3d---, 2017 WL 1959984 (9th Cir. May 12, 2017). *S.B.* also involved a Fourth Amendment excessive force claim. There the Ninth Circuit concluded, as the court has here, that taking the facts in the light most favorable to the plaintiff, the district court properly determined that a reasonable juror could find a constitutional violation. It then turned to the second prong of the qualified immunity analysis—the clearly established law prong. *Id*. at * 5. The court reiterated that this inquiry "'must be undertaken in light of the specific context of the case, not as a broad general proposition,'" and this is especially the case in the Fourth Amendment context, "where '[i]t is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts." *Id.* (quoting *Mullenix*, 136 S.Ct. at 308).

The Ninth Circuit went on to specifically note "the Supreme Court's recent frustration" with the appellate courts, and the Ninth Circuit in particular, in defining clearly established law "at a high level of generality." *Id*. (citing *City & County of San Francisco v. Sheehan*, 135 S.Ct. 1765, 1775-76 (2015)). In *S.B.*, the Ninth Circuit stated that it "hear[d] the Supreme Court loud and clear," indicating that to impose liability on the defendant it had to identify precedent as of the time of the conduct in question that put the defendant on notice that his conduct in the particular circumstances present violated the Constitution (in that case, constituted excessive force). *Id*. at * 6. The Ninth Circuit described *White*'s clearly established law standard as "exacting." *Id*. at *7.

Neither the Supreme Court nor the Ninth Circuit has specifically discussed what level of factual similarity is required in the context of an inmate action asserting a retaliation claim, particularly post-White. Therefore, the court is left with little guidance other than the Supreme Court's instruction that clearly established law should not be defined at a high level of generality, but that liability may still attach if pre-existing law makes the violation apparent.

Here, neither the parties nor the court is not aware of a case that is directly factually similar to the retaliation issues presented here; therefore, the court must decide whether existing

law nevertheless was sufficiently clear so as to put Defendants on notice that their conduct violated the Constitution.

It was well established at the time of the events giving rise to this action that prisoners had a First Amendment right to file prison grievances. *Rhodes v. Robinson*, 408 F.3d 559, 567 (9th Cir. 2005) (citing *Bruce v. Ylst,* 351 F.3d 1283, 1288 (9th Cir. 2003)). Without this "bedrock constitutional guarantee[ ], inmates would be left with no viable mechanism to remedy prison injustices." *Id*. It was also clearly established that "purely retaliatory actions taken against a prisoner for having exercised [that right] necessarily undermine[s] th[at] protection[ ]" and "such actions violate the Constitution quite apart from any underlying misconduct they are designed to shield." *Id*. (citing *Pratt v. Rowland*, 65 F.3d 802, 806 & n. 4 (9th Cir. 1995) ("[T]he prohibition against retaliatory punishment is 'clearly established law' in the Ninth Circuit, for qualified immunity purposes."). *Rhodes* involved a prisoner who alleged that officers confiscated, withheld and destroyed his property, threatened to transfer him to another institution and assaulted him because he exercised his right to file grievances. *Id*. at 568. In addition, in *Rizzo v. Dawson*, 778 F.2d 527 (9th Cir. 1985), the Ninth Circuit clearly held that prison officials could not transfer an inmate to another prison in retaliation for exercising his First Amendment rights.

In *Rhodes*, which was decided in 2005, the Ninth Circuit specifically stated that "'the prohibition against retaliatory punishment is clearly established law in the Ninth Circuit, for qualified immunity purposes.'" *Rhodes,* 408 F.3d at 569 (citing *Pratt*, 65 F.3d at 806).

The court must address whether this statement by the Ninth Circuit squares with the "exacting" clearly established law standard of *White*. The court finds that it does under these circumstances.

Defendants argue that Rhodes did not deal with an "organized, concerted effort of over a dozen inmates abusing the grievance procedure in an attempt to circumvent the petition prohibition" (ECF No. 131 at 2:21-23) and the conduct of charging these inmates with abuse of the grievance process (ECF No. 131 at 8:19-20). They contend that Rhodes did not address the "unique set of facts and circumstances" present here where "fifteen (15) inmates acted in lockstep to draft and submit hundreds of identical grievances." (ECF No. 131 at 15-16.)

While mindful of the Supreme Court's admonition in *White,* reiterated by the Ninth Circuit in *S.B.,* the court does not find that it needs to define the clearly established law from *Rhodes* and *Rizzo* any more narrowly. Defendants' argument that the law was not clearly established relies on the court accepting Defendants' version of the facts (that Plaintiff and the other inmates filed a host of grievances with the intent to harass in order to get back at prison officials for flattening the pagan grounds). In analyzing qualified immunity, however, the court must take the facts in the light most favorable to Plaintiff. *See e.g. S.B. v. County of San Diego,* --- F.3d. ---, 2017 WL 1959984, at *6 (9th Cir. May 12, 2017).

Under Plaintiff's version of the facts, after the Pagan grounds were flattened he and other inmates filed a multitude of grievances concerning various issues they wanted to raise in a lawsuit and Plaintiff advised defendant Emmanuel that he did not intend to be vexatious, but was trying to exhaust his administrative remedies as AR 740 required him to do before he could file a lawsuit. In addition, under Plaintiff's version of the facts, Defendants ignored his justification for filing the grievances, and proceeded to punish him with disciplinary segregation and a transfer to HDSP.

Whether the incident involved Plaintiff filing twenty grievances, or Plaintiff and other inmates each filing twenty grievances, the court is of the opinion that Defendants were on notice that subjecting Plaintiff to disciplinary action and transfer for filing grievances in order to exhaust his administrative remedies (as he asserts here) violates the Constitution via *Rhodes and Rizzo*.

The court does not find this version of facts to be so unusual such that Defendants would not have realized their conduct could violate the Constitution under *Rhodes*. *See Hope v. Pelzer,* 520 U.S. 730, 741 (2002) ("officials can be on notice that their conduct violates established law even in novel factual circumstances.").

Therefore, the court finds that viewing the facts in the light most favorable to Plaintiff, the contours of Plaintiff's right against retaliation were sufficiently clear so that reasonable persons in Defendants' positions would have understood that what they did violated the Constitution. As such, Defendants' renewed motion for summary judgment on qualified

immunity grounds should be denied as to the retaliation claim.

Insofar as the Free Exercise Clause, RLUIPA and Equal Protection claims are concerned, Defendants' motion generally states that there was no case prior to 2009 that would have put them on notice that their conduct violated Plaintiff's constitutional rights. (ECF No. 104 at 26, 28, 29.) Plaintiff's response focuses only on the retaliation claim in the discussion of whether the law was clearly established. (ECF No. 129 at 30-34.) Defendants' reply brief similarly focuses only on the retaliation claim. (ECF No. 131 at 14-18.)

Since none of the parties specifically briefed the issue of whether the law was clearly established with respect to the Free Exercise Clause, RLUIPA or Equal Protection claims, the court will not take up the issue sua sponte. Defendants' motion should remain denied as to these claims because they did not establish there was no violation of these constitutional rights under the first prong of the qualified immunity analysis.

### III. RECOMMENDATION

**IT IS HEREBY RECOMMENDED** that the District Judge enter an order **DENYING** Defendants' Renewed Motion for Summary Judgment Based on Qualified Immunity (ECF No. 104).

The parties should be aware of the following:

1. That they may file, pursuant to 28 U.S.C. § 636(b)(1)(C), specific written objections to this Report and Recommendation within fourteen days of receipt. These objections should be titled "Objections to Magistrate Judge's Report and Recommendation" and should be accompanied by points and authorities for consideration by the district judge.

2. That this Report and Recommendation is not an appealable order and that any notice of appeal pursuant to Rule 4(a)(1) of the Federal Rules of Appellate Procedure should not be filed until entry of judgment by the district court.

DATED: May 19, 2017.

William G. Cobb
WILLIAM G. COBB
UNITED STATES MAGISTRATE JUDGE